**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: ENTERPRISE RENT-A-CAR WAGE & HOUR EMPLOYMENT PRACTICES LITIGATION | |
| | MDL No. 2056 |
| NICKOLAS HICKTON, et. al. | Misc. No. 2:09-mc-00210-JFC |
| Plaintiffs, | Civ. No. 2:07-cv-01687-JFC |
| | Civ. No. 2:09-cv-00815-JFC |
| v. | Civ. No. 2:09-cv-00816-JFC |
| | Civ. No. 2:09-cv-00824-JFC |
| ENTERPRISE RENT-A-CAR COMPANY, et. al. | Civ. No. 2:09-cv-00832-JFC |
| | Civ. No. 2:09-cv-00833-JFC |
| Defendants. | Civ. No. 2:09-cv-01188-JFC |
| | Civ. No. 2:09-cv-01321-JFC |
| THIS DOCUMENT RELATES TO: | |
| *All Actions* | |

## MEMORANDUM OPINION AND ORDER

CONTI, District Judge.

Eight cases[1] brought against Enterprise Rent-A-Car Company and a number of affiliated

companies were consolidated by the Judicial Panel on Multidistrict Litigation for pretrial

purposes in this court. (See transfer order (Docket No. 132, Civ. No. 07-1687).) On September

---

[1] The following cases were consolidated by the Judicial Panel on Multidistrict Litigation: (1) Hickton v. Enterprise-Rent-A-Car Co., Civ. No. 07-1687 (W.D. Pa.); (2) DePina v. Enterprise Leasing Co. of Orlando, Civ. No. 6:09-359 (M.D. Fla.); (3) Galia v. Enterprise Rent-A-Car Co., Civ. No. 1:09-1504 (N.D. Ill.); (4) Gaudelli v. Enterprise Rent-A-Car Co. of Tennessee, Civ. No. 1:09-580 (N.D. Ga.); (5) Averill v. Enterprise Rent-A-Car Co., Civ. No. 1:08-4191 (N.D. Ill.); (6) Graham v. Enterprise Leasing Co., Civ. No. 1:07-23372 (S.D. Fla.); (7) Bromfiled v. Enterprise Rent-A-Car Co., Civ. No. 7:09-2403 (S.D.N.Y.); and (8) Hagler v. Enterprise Leasing Co.–South Central, Inc., Civ. No. 7:09-00910 (N.D. Ala.).

18, 2009, an amended master complaint was filed in the multidistrict litigation.  (Docket No. 35, Misc. No. 09-210.)  The amended master complaint alleges that the plaintiffs were assistant branch managers and branch managers employed at various rental locations, and allege that they were wrongfully classified by their employers as exempt from certain federal and state wage law protections, including the requirement of premium overtime pay.  The plaintiffs claim that they regularly worked in excess of forty hours per week, without receiving premium overtime compensation for those hours worked that exceeded forty hours per week.  Because the plaintiffs allege that, as managers, they were not exempt employees, and because defendants failed to pay managers premium overtime compensation for the hours worked in excess of forty hours per week, the plaintiffs claim that their employers violated the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 et seq. ("FLSA").  (See id.)

Pending before this court is a motion for conditional certification (Docket No. 73, Misc. No. 09-210) filed on October 22, 2009 by plaintiffs[2] seeking: (1) conditional collective class certification pursuant to the FLSA; (2) issuance of notice to all members of the putative class in accordance with Hoffman-La Roche v. Sperling, 493 U.S. 165 (1989); and (3) production to plaintiffs' counsel of the names and addresses of all members of the putative class.  The motion for collective action certification is brought only with respect to assistant branch managers and not branch managers.  Plaintiffs filed a memorandum of law in support of the motion (Docket

---

[2] The motion for conditional certification was filed by the following plaintiffs: Daniel Jackson, Beau McManus, Madelyn Miguel, Lavan Pettaway, James Richardson, Robert Rubino, Nicholas Stewart, Kimberly White, Yolanda Williams, David Altwerger, John Anderson, Shane Barnes, Gerald Bently, Matthew Fraier, Tori Gaudelli, Melanie Gizewski, Todd Godbey, Michael Hickman, Jonathon King, Brandon McCune, Melissa Opolinsky, Ian Panter, Kimberly Rickman ("Rickman"), Mona Shah, Todd Trego, Patrick Tueth, Michael Washington, Shane McVey, Travis Beau, Rick Albury, Melinda McQuaig ("McQuaig"), Joe Edmonds, Gabriel Mora, Timothy McGowan, Carl Salerno, Jared Leefers, Jordan Taylor, Mario Miguel Duron, Nickolas C. Hickton ("Hickton"), Elsa Depina, Christopher Carrol, Lindsey Carrol, Sally Baker, Karen Fisher, Adam Goldstein, Sergio Mendez, Miquel McDonald, Kevin C. Hagler ("Hagler"), Jeffrey Galia, Jasmine Bromfield, Nils Hagstrom ("Hagstrom"), Robert Bajkowski ("Bajkowski"), Donnashekia Richard, Michael Keith Averill, Jr., Wayman F. Graham, II ("Graham"), Kristen Benson, Megan Berryhill, Michelle Daniels, Chris Endres, Kevin Rhinesmith, Michael Crabtree, Jeremy Edwards, Jacques Fenold, Eric Rivera, Ryan Smith, Josh Cunningham, Luis Laboy, Reinaldo Lamadriz, Maurice Hansberry, and Solange Hordatt (collectively, "plaintiffs").

No. 75), and a declaration of attorney Robert W. Biela (Docket No. 76). Exhibits in support of the motion were attached to the declaration.

On February 26, 2010, defendants[3] filed a memorandum in opposition to plaintiffs' motion (Docket No. 129), and an appendix of exhibits in support of defendants' opposition (Docket Nos. 130 and 131). On March 29, 2010, plaintiffs filed a reply brief in support of the motion (Docket No. 151), and a declaration of attorney Peter A. Muhic, to which supportive exhibits were attached (Docket No. 152). On June 25, 2010, plaintiffs filed a notice of supplemental authority (Docket No. 183). On July 7, 2010, defendants filed a response to the notice of supplemental authority (Docket No. 193). On August 6, 2010, plaintiffs filed a second notice of supplemental authority (Docket No. 196).

*Background*

**A. Nature of Corporate Relationships and Operations**

ERAC-Missouri is a Missouri corporation that maintains its principal place of business in St. Louis. (Appendix of exhibits in support of defendants' opposition to motion for conditional certification ("Defs.' App.") (Docket Nos. 130-31), Ex. 1 ¶ 3). ERAC-Missouri is the parent corporation of thirty-eight operating subsidiaries engaged in the business of renting and selling

---

[3] The following defendants responded to the pending motion: (1) Enterprise Rent-A-Car Company ("ERAC-Missouri"), (2) Enterprise Rent-A-Car Company of Tennessee, (3) Enterprise Leasing Company – South Central, Inc., (4) Enterprise Rent-A-Car Company of Pittsburgh, (5) Enterprise Rent-A-Car Company – Midwest, (6) Enterprise Leasing Company of Philadelphia, (7) Enterprise Leasing Company of Orlando, (8) Enterprise Leasing Company of Chicago, (9) Enterprise Leasing Company (Florida Corporation), and (10) ELRAC, Inc. These defendants later changed their structure from corporations to limited liability companies with the following official names: (1) Enterprise Holdings, Inc., (2) Enterprise Rent-A-Car Company of Tennessee, LLC, (3) Enterprise Leasing Company–South Central, LLC, (4) Enterprise Rent-A-Car Company of Pittsburgh, LLC, (5) Enterprise Rent-A-Car Company–Midwest, LLC, (6) Enterprise Leasing Company of Philadelphia, LLC, (7) Enterprise Leasing Company of Orlando, LLC, (8) Enterprise Leasing Company of Chicago, LLC, (9) Enterprise Leasing Company of Florida, LLC, and (10) ELRAC, LLC. (Docket No. 136.) Since by an order entered on the date of this opinion, ERAC-Missouri is no longer a defendant, reference to defendants in this memorandum opinion will refer to the remaining nine defendants. Those defendants are operating subsidiaries of ERAC-Missouri.

vehicles within the United States.  (Id. ¶ 5.)  In the consolidated cases, nine operating

subsidiaries were sued and joined as defendants in the amended master complaint.  (See Docket

No. 35.)  ERAC-Missouri does not rent vehicles, but instead is a company that holds the stock of

operating subsidiaries and offers a range of administrative services to its operating subsidiaries.

(Id. ¶¶ 13-16.)  It is economically beneficial for ERAC-Missouri to provide these services to the

subsidiaries, because it can achieve economies of scale.  (Id. ¶ 18.)

The operating subsidiaries are assigned regions in which they rent and sell vehicles to

consumers.  (Id. ¶ 21.)  They build their businesses according to strategies and policies adopted

based upon their circumstances and preferences.  (Id. ¶ 25.)  Each operating subsidiary is a

separate and distinct company.[4]  (Id. ¶ 6.)  Internal documents refer to ERAC-Missouri and all

operating subsidiaries collectively as "Enterprise."  (See, e.g., declaration of Robert Biela in

support of plaintiffs' motion for conditional certification ("Pls.' App."), Ex. C at E-002425.)

Edward Adams ("Adams"), senior vice president, human resources of ERAC-Missouri, testified

that ERAC-Missouri and the operating subsidiaries refer to themselves as "the Enterprise brand."

(Pls.' App., Ex. D at 50-51.)  Timothy Nettles ("Nettles"), the vice president and general

manager of ERAC-Pittsburgh, testified to the importance of establishing and maintaining a

certain level of consumer expectations consistent across the Enterprise network:

> Q.     What is the Enterprise brand?  What does that refer to?
>
> A.     Well, I don't think that there is a definition per se.  I can
> tell you what it means to me.
>
> Q.     Okay.
>
> A.     It is the trade dress that we put on the buildings.  If I want
> to  be  consistent,  I  want  my  customers  to  know  that  it's  an

---

[4] Prior to August 1, 2009, the operating subsidiaries were organized as corporations governed by a board of directors.  (See Docket No. 132.)  After that date, the operating subsidiaries were restructured as limited liability companies with members who had powers similar to those of the boards of directors, but with some broader powers.

Enterprise branch when they walk into it. From that standpoint, I want consistency as far as the interiors look. We talked about the dress code. I want my people looking a certain way. To me, that's the part of the brand.

Any type of sales collateral that we use, I want that to be consistent.

I think our whole customer service model, ESQi, how we treat customers, I think that becomes part of the Enterprise brand. How we react in the community, we are very active in the local community here. I'm on several boards. Diversity is a big topic for me. I want a diverse work force. I think that reflects on our brand.

Q.     Does Enterprise Pittsburgh derive any benefits from being associated or affiliated with the Enterprise brand?

A.     Well, I think that's why I don't have Hertz or Avis or Budget or National above the door. It's Enterprise Rent-A-Car. And we all have worked very hard in our subsidiaries to build that brand, build our customer base, which is also part of the brand, so that we can continue to grow and continue to make money for both the company and our employees.

Q.     So the Enterprise brand, that's important for the business.

A.     It's important to me.

Q.     It's important to you.

A.     Absolutely.

Q.     And it's important to Enterprise-Pittsburgh.

A.     Oh, absolutely.

Q.     Do you think that Enterprise brand is also important to the parent company?

A.     I would hope so.

(Pls.' App., Ex. E at 202-03.)

Each operating subsidiary maintains authority over its day-to-day operations, including operating hours, prices, and purchases and sales of vehicles. (Defs.' App., Ex. 1 ¶¶ 28-31, 33).

Each is headed by a general manager.  (Id. ¶ 24.)  The general managers are given broad

decision-making authority.  (See, e.g., Defs.' App., Ex. 2 ¶ 25.)  Each subsidiary has discretion

over its employment policies and practices, including hiring, termination, promotion, and

compensation for almost all employees, including assistant branch managers.  (Defs.' App., Ex.

1 ¶ 30.)  In exercising that discretion, each operating subsidiary determines the duties and

responsibilities of its employees and determines whether employees should be classified as

exempt from overtime laws.[5]  (See, e.g., Defs.' App., Ex. 2 ¶ 43; Defs.' App., Ex. 3, ¶¶ 31-32;

Defs.' App., Ex. 4 ¶¶ 38-43.).  Several operating subsidiaries developed unique operating

practices and procedures.  (See, e.g., Defs.' App., Ex. 2 ¶¶ 54-56, Defs.' App., Ex. 3 ¶¶ 53-58;

Defs.' App., Ex. 4 ¶¶ 53-56.)  Some subsidiaries have divisions or regions, which have a level of

autonomy.  (See, e.g., Defs.' App., Ex. 3 ¶ 58.)

    Vehicle rental activities occur in branches operated by the subsidiaries.  (See Defs.' App.,

Ex. 1 ¶ 21.)  The branches are staffed, based primarily on their volume and type of business, with

varying combinations of branch managers, assistant branch managers, management assistants,

management trainees, car preps, drivers, and interns.  (See, e.g., Defs.' App., Ex. 2 ¶ 48; Defs.'

App., Ex. 3 ¶ 47.)  The kind of customer varies depending upon the particular clientele of the

branch: branches that primarily service corporate accounts have a high percentage of business

travelers; whereas, branches that primarily service insurance companies and repair shops rent

cars to persons whose vehicles are under repair.  (See, e.g., Defs.' App., Ex. 3 at ¶¶ 44-46.)

    The services provided by ERAC-Missouri to the operating subsidiaries include the

creation of materials on human resources matters, such as recommended job descriptions (Pls.'

App., Ex. D at 115; see, e.g., Pls.' App., Ex. F), performance review forms (Pls.' App., Ex. D at

_____

[5] The memorandum opinion filed concurrently with this opinion addresses in greater detail the nature of the
relationship between ERAC-Missouri and the operating subsidiaries, including recommendations made by ERAC-
Missouri to the operating subsidiaries.

141), a management compensation guide (see id. at 221), and recommendations concerning whether certain positions should be exempt from the overtime provisions of the FLSA (see id. at 297). Adams testified that ERAC-Missouri created job descriptions for positions at the operating subsidiaries and distributed them to the operating subsidiaries. (Pls.' App., Ex. D at 115.) The job descriptions list responsibilities for various positions. (Id. at 116.) For example, Adams acknowledged that a job description was provided that represented ERAC-Missouri's "determination of general duties and responsibilities of an assistant branch manager." (Id. at 118.) The subsidiaries do not maintain their own job descriptions for the positions. (Id. at 123.) The descriptions are compiled in a job description database maintained on the intranet managed by ERAC-Missouri's corporate human resources department. (Id. at 134.)

Another service offered by ERAC-Missouri to the operating subsidiaries was the creation and distribution of a "Management Compensation Guide." (Defs.' App., Ex. 19 ¶¶ 10-11; Pls.' App., Ex. G.) The compensation guide was created based upon a review of the practices being used by the subsidiaries. (Defs.' App., Ex. 19 ¶ 10.) The compensation guide recommended compensation for various employees, including assistant branch managers. (Pls.' App., Ex. G at E-001641, E-001642.) It recommended that assistant branch managers be paid an annual salary ranging from $26,400 to $29,700, and a percentage of monthly profits generated by the branch. (Id.) ERAC-Missouri recommended the subsidiaries classify assistant branch managers as exempt under the FLSA from receiving overtime compensation. (Pls.' App., Ex. D at 297.)

Adams testified that, even though the recommendations were not binding upon the subsidiaries, all subsidiaries outside of California followed the recommendations and classified assistant branch managers as exempt from the FLSA overtime provisions:

> A.    . . . We would recommend to the subs that these are exempt positions.

Q.     Okay.

A.     It is for them to decide.

Q.     To your knowledge, do any of the subsidiaries pay – despite the recommendations made in the compensation guide, pay assistant branch managers on an hourly basis?

A.     Yes.

Q.     Okay. To your knowledge, are the – are those locations within California?

A.     To the best of my knowledge, they're in California.

Q.     Okay. To your knowledge, do any of the subsidiaries outside of California pay assistant branch managers on an hourly basis?

A.     I'm not aware of any.

Q.     Okay. To your knowledge, despite the recommendation in the compensation guide, do any operating subsidiaries pay branch managers on an hourly basis?

A.     I'm not aware of any.

Q.     Okay. And that's both within California, outside of California?

A.     That is correct.

(Id.)

Operating subsidiaries doing business in the United States, with the exception of subsidiaries in California, employ approximately 3,000 assistant branch managers. (Defs.' App., Ex. 19 ¶ 9.)  The recommended primary duty of each assistant branch manager reflected on the job description is to participate in the management of the assigned branch, its employees, and its operations. (Pls.' App., Ex. F.)  On the job description, each assistant branch manager's recommended job responsibilities focused upon the areas of management of customer service

and operations, human resource management, sales and marketing, financial performance, and fleet management and maintenance.  (Id.)  Each recommended management area includes a broad spectrum of duties and responsibilities.  The job description noted that the daily duties and responsibilities of each assistant branch manager, however, varied "from individual to individual, location to location, and over time, depending on a number of factors."  (Id.)

## B. Plaintiffs' Declarations and Testimony

### 1. Declarations

Various plaintiffs, who were assistant branch managers, submitted substantially the same declarations portraying their daily job responsibilities as primarily comprised of nonexempt duties.  (See Pls.' App., Exs. H-K, M-R, T-Z, AA-CC, FF, GG.)  They allege they were employed by both ERAC-Missouri and the relevant operating subsidiary.  (See, e.g., Ex. H ¶ 2.) They assert that their management responsibilities were limited, and they did not have authority to hire, fire, promote, demote, or discipline employees.  (See, e.g., Ex. H ¶¶ 5, 6.)  Instead, branch managers and general managers made those decisions.  (Id.)  Those plaintiffs assert they did not make recommendations regarding these matters.  (Id.)

Plaintiffs aver in the declarations that all assistant branch managers shared substantially similar job duties and responsibilities.  (See, e.g., Ex. H ¶ 14.)  They assert that they spent the majority of time performing tasks related to the renting of vehicles, such as cleaning and washing cars, picking up and dropping off cars, and completing rental paperwork.  (See, e.g., Ex. H ¶ 7.) Assistant branch managers completed the same tasks as management trainees, and that their base compensation as assistant branch managers was less than when they were management trainees. (See, e.g., Ex. H ¶ 7; Ex. FF ¶ 7.)  They also assert that at no point during their employment did

anyone from upper management ever ask them what their duties were or inquire about what they did on a daily basis.  See, e.g., Ex. H ¶ 17.)

### 2. Testimony of Sample Plaintiffs[6]

#### a. Hagler

During his deposition, Hagler, an assistant branch manager at a branch in Tuscaloosa, Alabama, testified that he "assumed" he was "employed by Enterprise Leasing Company South Central."  (Defs.' App., Ex. 23 at 29.)  With respect to whether he had the authority to hire employees or participate in their interviews, he testified as follows:

> A.      It's just based off of, I guess, what I've seen as my time as a – as a management trainee, management assistant downtown, and even there in Tuscaloosa.  That just wasn't the form for an assistant manager to bring someone off the street and hire them on as a driver.
>
> Q.      Okay.  And are you also saying that in other areas or in Tuscaloosa –
>
> A.      Uh-huh.
>
> Q.      – when drivers are hired, assistant managers don't participate in the interview process?
>
> A.      I'm not – I'm not for certain.
>
> Q.      You don't know one way or the other?
>
> A.      I haven't participated in an interview – interview of a driver.
>
> Q.      Right.  Well, I understand.  We established that.
>
> A.      Right.

---

[6] On September 11, 2009, this court entered a discovery order that governed discovery with respect to conditional collective action certification.  (Docket No. 29.)  The ordered provided: "There may be up to ten sample plaintiffs for this stage of discovery. The defendants may identify up to four sample plaintiffs (other than Plaintiff Hickton). The plaintiffs may identify up to five additional sample plaintiffs."  The following individuals were selected as sample plaintiffs: Bajkowski; Joseph Biski ("Biski"); Graham; Hagler; Hagstrom; McQuaig; Rickman; Brandon Singleton ("Singleton"); and Hickton.  (See Docket No. 91 ¶ 6.)

Q.    When you were an assistant manager, no drivers were hired?

A.    Right.

Q.    What I'm asking is whether to your knowledge assistant managers participated in the interview process of hiring drivers?

A.    To my knowledge, I don't know.

Q.    You don't know?

A.    Right.

Q.    One way or the other?

A.    Right.

Q.    Okay.  So they might?

      . . . .

A.    It would be highly unlikely.  I – I would say.

Q.    Why – why would you say that?  If you don't know, why would – how do you have any basis to – to – to assess the relativeness of that?

A.    Because I never was told that we had the ability to hire a driver.

(Id. at 74-75.)

Hagler had no personal knowledge regarding the duties of assistant branch managers outside of ERAC-South Central.  (Id. at 104-05.)  He testified that the duties may vary somewhat between branches:

Q.    Now, tell me how there might be differences between branches as to what assistant managers may do?

A.    Well, I think the – the rental mix has a – has a large part to do with it.  You may have a branch that may be insurance heavy.  You may have a branch that may be retail.  I guess just from a

11

general standpoint it's all, I guess, the same duties, but sometimes there may be different – different actions taken by those different assistant managers depending upon the environment that their – their office is in.

Q.      Okay.  Can – can you give me an example of how the rental mix might change the duty of an assistant manager?

            . . . .

A.      If – if – if – I guess in maybe a smaller branch there may not be as many cars to – to fleet manage or as many employees to try to kind of motivate, you know.  So their duties may be a little bit less, and a smaller branch may not have as many duties as it would be maybe in a larger branch.

Q.      And like, for example, are you familiar with what they to at the airport branch at all?

A.      Somewhat, yes, sir.

Q.      Okay.  Do you know if the assistant managers have the similar back-end responsibilities at the airport branch that they might have at a home city branch?

A.      It's my assumption that it would be a little different because the airport, this is a little bit different set-up.

(Id. at 105-07.)

Hagler testified that his branch manager and area manager, although they may not have inquired what his duties were, "had a pretty good idea" and "knew" what he "did most days." (Id. at 109-10.)  Hagler was asked if he was compensated more as an assistant branch manager than as a management trainee, and he answered "[r]oughly"; he testified, however, that he could not recall exactly because he did not "have it here in front of" him.  (Id. at 110.)

### b. Bajkowski

During his deposition, Bajkowski, an assistant branch manager at branches in Chicago, Des Plains, and Skokie, Illinois, testified that the duties of assistant branch managers might vary depending on the business mix of their branches:

Q.      Okay.   What about managing the fleet?   And let's talk about when you're at C1.  Tell me about the business mix at C1?

A.      Mostly insurance business.

Q.      Okay.  And was there retail business, too?

A.      Yeah, there was some retail business, too.

Q.      Okay.  Were there any corporate accounts?

A.      Yeah, there were some corporate accounts.

Q.      Okay.

A.      So mostly was – was insurance business of all body of the body shops.  Probably like 70 percent and then the 30 percent was all retail or – or corporate.

Q.      What was the business mix of same at NH as it was at C1?

A.      C – at – there was at NH it was more dealership.  So it was probably like 40 percent dealership, 40 percent insurance.

Q.      Is there a difference in the way that the – the branch sort of operates itself based on the fact that one's insurance or one's dealership?

        . . . .

[A.]    Yeah, it was a little bit different, yeah.

        . . . .

Q.      Okay.   Tell me about some of the difference between working at branch where you're dealing mainly with insurance replacement and working at a branch where there is mainly dealership work?

A.     Most of that – the customers that rent cars, mostly it's only a day or a few hours in the dealership.  With insurance rental it's a few days, a week or two weeks.  So it's a different type of rental.

Q.     Okay.  And – and if somebody's out for a week or two, you've got to be a little bit proactive in managing what your fleet looks like, correct?  Or am I wrong about that?

A.     Yes.

Q.     Okay.  And so if you are at C1 and you're the assistant branch manager, you have some responsibility, don't you, to make sure you have the right number of cars on your lot, you have the right sizes, you have the right mix, etc.?

A.     Yes.

(Defs.' App., Ex. 21 at 27-29.)  Bajkowski also worked at a branch referred to as "1553," which had a "40 percent dealership, 40 percent insurance" mix that was similar to "15NH."  (Id. at 38.)

Bajkowski testified that he assumed the management responsibilities of the branch manager, including responsibility for scheduling of employees and managing the fleet, while the branch manager was gone for four to five months on medical leave.  (Id. at 19.)  He testified that he worked with "MTs," and also "part-time employees, drivers, car preps, porters, [and] interns." (Id. at 40.)  The "1553" location had satellite offices, and he was given "responsibility for the financial performance" of one of the satellites.  (Id. at 43.)  These responsibilities included directing "porters to clean the car or which car to clean first."  (Id.)  Bajkowski testified about his job duties:

Q.     Is it your testimony that there is no difference between what assistant branch managers do and what MTs do at Enterprise Rent-A-Car?

A.     Most of it, yeah, but there are some – some differences.

Q.     Tell me what the differences are?

14

> A.     I would have – I would have interviews with car preps or future MTs.
>
> Q.     Okay.  What do you mean interviews?
>
> A.     If it was scheduled by H.R.  So the first interview that would come to me, I would show them the branch and then I would get the fax with the question have to ask them, ask them the question and write the answers.
>
> Q.     And you would make comments on how those interviews went?
>
> A.     Yes.
>
> Q.     Okay.    And would you submit those comments to somebody?
>
> A.     Yeah, I would fax it to H.R.
>
> Q.     And do you know if those comments were ever considered by people making hiring decisions or promotion decisions or whatever the case may be?
>
> A.     Yes.

(Id. at 24-25.)  He testified he had "the same responsibilities when I was MT or MA, I would write tickets or clean cars.  I would do the same things."  (Id. at 67.)

Branch managers served as the "counter quarterbacks" at the branches where he worked. (Id. at 67-68.)  With respect to whether he had responsibility to "teach, train, motivate and manage employees," Bajkowski testified that those duties were for the branch manager.  (Id. at 92-93.)  The branch managers wrote "marketing flex plans" for employees.  (Id. at 109.) Bajkowski stated that he spoke to "10 to 15" assistant branch managers and observed the job duties they were performing.   He also spoke to two other assistant branch managers specifically with respect to their duties.  (Id. at 75, 160-61.)

Bajkowski testified that he did not conduct reviews of employees such as car preps or drivers, but merely added comments to completed review forms. (Id. at 56.) He testified he did not know whether other assistant branch managers may have conducted such reviews. (Id. at 56-57.) He spent approximately "60 percent" of his time "writing tickets, picking up customers, driving them back, cleaning cars." (Id. at 112.) He did these same tasks "as an MT or MA." (Id.) He spent "5 percent" of his time doing "call backs," which he also did "as an MT or MA." (Id. at 113.)

On Bajkowski's résumé he noted he is a

> [d]edicated management professional with extensive experience leading profit generating operations. Effective leader skilled in highly productive sales driven teams implementing by customer-focused training and sales programs. Exceptional ability to establish rapport with customers, gain trust and build strong repeat and referral business.

(Defs.' App., Ex. 32.) His experience was based on working at "Enterprise Rent-A-Car" and "Jacobs Twin Auto Plaza." (Id.)

### c. Singleton

Singleton, an assistant branch manager at branches in Chicago and Mattson, Illinois, testified during his deposition that an assistant branch manager's job duties could vary to some extent depending upon the business mix of a particular branch:

> Q.     Do you believe the business mix at the branch can affect the job duties of the assistant branch manager?
>
>        . . . .
>
> A.      It could.
>
> Q.     Okay. Like in what way?
>
> A.     Well, if you have a – if you are doing callbacks, one branch may have a dealership and you call and contact a dealership and

talk to service managers.  At the airport you don't generally do that.

You don't necessarily have to worry about at the airport contacting insurance adjusters and talking to agents.

That is the two ways.

Q.      You said the airport.  What about like if there is a home city retail branch and then, you know, one is right across the street from a dealer and it is heavily dependent on that dealer business and other is in an area where it is just all sort of retail business or insurance replacement, I mean does the variability of the business mix change the duties of what goes on at the branch in your opinion?

. . . .

A.      It can change things a little.

. . . .

Q.      If you have all corporate accounts, right, presumably you would have less callback issues, correct?

. . . .

A.      That is not necessarily true.  That is not necessarily true.

Q.      What about dealerships, if you have all of the dealership business, do you think you have less callbacks in that circumstance?

. . . .

A.      Well, no, you don't have less callbacks.  Callbacks, you would have – whoever is in the vehicle, that is the callback.

Q.      So the fact that it is a dealership doesn't necessarily change that?

A.      No. . . .

Q.      What about in terms of managing the fleet?  If there is a dealership and it provides – You know, I assume then you get the calls whenever somebody comes in and says we need a car, I assume that is going to be a little bit more unpredictable than if

you have got a steady series of corporate accounts or maybe something like that? Do you agree with that?

. . . .

It occurs to me that if you have a branch that has got a lot of dealership business, that the reservations, the customers, are going to depend on the day by who comes into the dealership. You are not going to know that in advance. Would you agree with that?

A.     Yes, you are not always going to know if a customer comes in.

Q.     And that could provide some variability then as opposed to a branch that has a more regular stream of retail business or something like that; would you agree with that?

A.     I am not sure how it would.

. . . .

Q.     Then I would assume then if you have that dealership business where you have that increased need, then there is increased pressure on you to manage the fleet because you might not have enough cars at the beginning of the day or you might have too many cars or it may be very unpredictable in terms of how you are going to keep your fleet at the right size?

. . . .

Would you agree with that?

A.     It could make a difference.

Q.     Well, are there any branches to your knowledge that have a pretty steady stream of business so that when they come in, they open up on Monday, they have a pretty good idea what is going to happen there that day?

A.     Just in my experience, a Monday is – a Monday morning is pretty busy across the board. Like it is pretty much – I mean there is some – There maybe can be some differences, but it is pretty much going to be – You would be able – I don't know. You can kind of know what to expect. I mean you can know what to expect. It is going to be a lot of returns, it is going to be a lot of

renting, however your branch works. It can go either way, you know.

(Defs.' App., Ex. 26 at 114-19.) When asked if he had knowledge of the job duties of assistant branch managers working at branches outside of Chicago, he answered: "No. I wouldn't know that." (Id. at 120.) He did not know whether assistant branch managers at other branches participated in the reviews of employees. (Id. at 134.)

Singleton submitted an employment application to the Chicago Fire Department. (Defs.' App., Ex. 30.) The application provides a one-line space to "explain your duties" with respect to prior employment. (Id. at ERAC-CFD000004.) With respect to his position with "Enterprise Rent-A-Car," Singleton wrote: "Making all business decisions and directly responsible for increasing revenue." (Id.)

### d. Hickton

During Hickton's deposition, he testified that it "was a fair statement" to say that the branches had different mixes of customers with a different range of needs. (Defs.' App., Ex. 17 at 142.) Hickton, an assistant branch manager for ERAC-Pittsburgh, testified with respect to the job duties and responsibilities of assistant branch managers:

> Q.      So is it fair to say that what a branch manager does at truck is different than what a branch manager does at the airport?
>
>          . . . .
>
> A.      I wouldn't say that – no, I wouldn't say that the primary or majority of responsibilities are that much different, no.
>
> Q.      Well, at least with respect to rates – right – he was certainly working on rates far more frequently than you were in truck?
>
> A.      Yes, George was working on rates more frequently at the airport than I was working on rates at truck, yes.

Q.    How many trucks did you have responsibility for at that branch, roughly?  What was the fleet size?

A.    40 at any given time, 30 to 40 trucks.

Q.    Do you think the fact that George had 500 cars and you had 40 trucks might make any difference in what you did on a day-to-day basis than what George did on a day-to-day basis?

         . . . .

A.    I don't think that George having 500 cars and me having 40 trucks made a difference.  As branch manager we're all responsible for the same activities.

Q.    George had what, 40, 50 more than that employees at the airport?

A.    I don't know exactly how many employees he had when I was at truck rental.

Q.    When you were at the airport, there were at least that many folks working there; right?

A.    Maybe.

Q.    And at truck, let's see, you had Don, Nick, Gino, and the other car prep.  I count four.  Do you think there was any difference between your responsibilities on a day-to-day basis managing four people and his overseeing a staff of 40, 50, or more?

A.    I think he did it on a grander scale, but I don't think there was a difference in responsibilities.

(Id. at 281-82.)

### e. Hagstrom

Hagstrom, an assistant branch manager at a branch in New York City, New York, testified during his deposition that he and the branch manager often alternated when they were present at the branch.  (Defs.' App., Ex. 24 at 37-38.)  Sometimes neither a branch manager nor assistant branch manager was there:

> Q.     Was there an effort to make sure during the time you were
> an assistant manager that either you or the branch manager was
> present at any given time if that was possible?
>
> A.     Sometimes there would just be an MT there running the
> branch, or an [sic] management assistant.  It didn't have to be a
> branch manager or assistant manager.  There were days where it
> didn't open up, or we would open up and there was no branch
> manager or assistant manager there.

(Id. at 38.)  As an assistant branch manager Hagstrom did not actively participate in personnel

decisions, conduct employee reviews, perform any human resource management functions,

control the schedule for employees, develop strategies for solving issues, establish a system for

record retention, or know how to report receivables or "bad dent accidents" until his last month

with the company.  (Id. at 156-59.)  Hagstrom recalled attending a training that instructed the

assistant branch manager to be the "counter quarterback," and that he sometimes considered

himself in this role.  (Id. at 218.)  Hagstrom never disciplined an employee, although on one

occasion he sent an email as a "writ[e] up" for an employee.  (Id. at 257.)

On Hagstrom's résumé he described his responsibilities with respect to his position with

"Enterprise Rent-A-Car, New York, New York," as follows:

> • Managed 15 employees within 2 rental offices, including
> management trainees, management assistants, interns and car
> maintenance personal [sic]
> • Trained and developed employees in sales, service, marketing
> and management skills
> • Increased fleet size by 10% in first six months as assistant
> manager though marketing to local body shops, insurance agents
> and businesses – set up 15 corporate accounts including 1 national
> account
> • Produced revenues of over $120,000 per month.

(Defs.' App., Ex. 29.)  Hagstrom testified the résumé was accurate with respect to "some of what

happened with Enterprise Rent-A-Car" and that: "It's been a while since I've worked for the

company.  I would say it's in the best of my knowledge, everything that I said in that statement was true before I left."  (Defs.' App., Ex. 24 at 13-14.)

### f. Graham

During his deposition, Graham testified that he worked as a management trainee, assistant branch manager, and branch manager at several branches in Miami, Florida.  (See Defs.' App., Ex. 20 at 13.)  When asked about his FLSA claims, he stated they were based upon his belief that he had identical job responsibilities regardless whether he was paid a salary or on an hourly basis:

> Q.    Mr. Graham, what's your understanding of the claims that you're making in this lawsuit?
>
> A.    My understanding is when you have the same – when you're actually doing the same job and you're not getting paid overtime – you're actually – you have a salary, but you're doing the same job – you're supposed to be compensated for actually doing the same job.
>
> Q.    And in particular, what job or jobs are you talking about? Which jobs are the same?
>
> A.    Writing contracts, closing out customer contracts. Essentially everything I did as an MT was the same as I did as assistant manager, and mostly what I did as a branch manager as well.

(Id.)  He worked at a branch located at a Holiday Inn, where the majority of the rentals were to tourists or to individuals whose cars were being serviced or repaired.  (Id. at 63.)  He worked at an airport branch location.  (Id. at 85.)  He did not "enjoy" working with a particular branch manager, and that experience might "have been significantly different" if he had worked with a different branch manager.  (Defs.' App., Ex. 20 at 12-13.)

The employees that most often interacted with assistant branch managers varied, depending on whether the assistant branch manager worked "outside" or "inside."  (Id. at 138.)

The "opening assistant manager" would have responsibility for opening the office. (Id. at 139.) Graham testified that, as an assistant branch manager, he was held accountable for the customer service performance of subordinate employees. (Id. at 160.)

Graham gave "instruction" to two car preps.[7] (Id. at 105-06.) Graham testified that, although reservationists received assistance from assistant branch managers for purposes of dealing with customers, reservationists also received similar assistance from management trainees and other employees. (Id. at 107-08.) Employees could not come to Graham as the assistant branch manager and request to leave work before a shift was complete:

> Q.     Okay.  And if [the branch manager] was unavailable, is it fair to say that [a reservationist] Ms. Ortiz and her colleagues might come to you, if you were the assistant manager on duty, to ask for permission, for example, if they had to leave early.
>
>         . . . .
>
> A.     No.  She couldn't come to me and ask me if they could leave early.
>
> Q.     If Ms. Ortiz told me that, is she mistaken?
>
> A.     To the best of my knowledge, she'd be mistaken.
>
> Q.     What would you do if one of the reservationists had come to you and asked to leave early?
>
> A.     I'd refer them to the branch manager.
>
> Q.     Well, now, what if it was at night or on the weekend and the branch manager wasn't there?
>
> A.     Every branch manager has a cell phone, and there's always going to be a time when you can actually get in contact if a branch manager's not there.
>
> Q.     So you would have to make that call to the branch manager by telephone?

---

[7] For purposes of Graham's deposition, the term "instruction" was defined by counsel for defendants. (See Defs.' App., Ex. 20 at 106.)  The court, however, cannot discern from the record how "instruction" was defined.

> A. Absolutely.

(Id. at 109-10.)

Graham recalled each assistant branch manager was assigned a team of three to four employees, and the assistant branch manager was given the title of captain for the team. (Id. at 150-51.) He, however, was not responsible for training and development of the employees on his team. He testified:

> I was not responsible for the training and development of employees on our – on our team.
> Essentially, we would have competitions, and the people on your team that actually did the best or had the best sales or had the best so and so – you'd actually get something for that team.
> So everyone in the office was – was influential in helping to train and assist others – period.
> It wasn't based on team.
> Any MT could help another MT; any assistant could help another assistant or an MT; any MT could help another assistant.

(Id.)

When asked if he provided verbal feedback to employees, such as stating "[g]ood job" or explaining matters that needed to be corrected, Graham testified he would do so:

> I would – I would say that's definitely a fair assessment.
> I mean the term, "subordinates –" I mean, again, an MT or MA would provide the same feedback to them.
>
> . . . .
>
> Q. But you would also provide that kind of feedback, "Good job" or "Here's how you need to correct things," to MAs and MTs in your capacity as an assistant manager, correct?
>
> A. Generally, I would.

(Id. at 164.)  Graham testified that he conducted training regarding customer service, sales and marketing, local office management, airport office management, and "Management Qualification Interview" training.[8]  (Id. at 175-78.)

On Graham's résumé he stated that while employed with "Enterprise Rent-A-Car, Miami, FL," he:

> Managed and trained several employees all aspects of marketing, sales, customer service, and debt collection on all business accounts and personal rentals.  Ascertained and maintained local business accounts in respective market area.  Responsible for maintaining (mechanical and physical damages), over 240 vehicles in fleet, equating over $3.5 million in inventory.  Responsible for several employee promotions, including promotions from local market to the corporate sector.  Increased fleet 22%, customer service scores increased 25% (62% to 87% completely satisfied).  Responsible for ensuring customer service excellence in branch, as well as ensuring positive profit gains from previous fiscal year.  Position also included properly balancing cash, ensuring proper credit card qualifications are met, ensuring employee safety standards are kept.

(Defs.' App., Ex. 33.)  Graham testified that this was an accurate description of "some of the duties and responsibilities of branch managers."  (Defs.' App., Ex. 20 at 317.)

### g. McQuaig

During her deposition, McQuaig, an assistant branch manager at a branch in Waycross, Georgia, testified an assistant branch manager worked at a branch that did not have a branch manager for a four-month period, and she confirmed that this individual "was running the branch basically by himself" during that period.  (Defs.' App., Ex. 25 at 18.)  That individual was eventually promoted to branch manager.  (Id.)  McQuaig, who was the assistant branch manager under that individual, assumed his responsibilities after he left his position in October 2006, and

---

[8] It is not clear from the record whether he conducted this training in his role as an assistant branch manager or branch manager.  He indicates a branch manager "would definitely be inclined to listen" to insight on sales and marketing, even though he "wouldn't say the branch manager" needed an explanation about how to generate corporate leads.  (Defs.' App., Ex. 20 at 177.)

McQuaig held this authority until she left the branch on November 27, 2006. (Id. at 19-20.)

McQuaig was questioned with respect to her job responsibilities as a management assistant and

management trainee:

> Q.     So when you were a management assistant and
> management trainee, were you accountable for the performance of
> the other employees in the branch?
>
> A.     We're not – we're not exactly held accountable, you know.
> But the goal was to help everybody, you know. It's a team – team
> effort and it takes everybody that's in the office to make it succeed.
>
> Q.     And when you become an assistant branch manager, the
> performance of all the employees in the branch affected your
> compensation.
>
> A.     Well, ultimately, yes.

(Id. at 72.)

Although McQuaig made clear that car preps understood what their general job

responsibilities were and needed little guidance in performing their tasks, she "[p]robably at

times" would tell a car prep to "do something." (Id. at 72-73.) Management trainees and

management assistants also had the same capability to direct the performance of car preps. (Id.

at 73-74.) Assistant branch managers could direct management trainees and management

assistants to do certain tasks. (Id. at 74-75.) She testified about securing corporate accounts:

> Q.     You said before that one of your strengths as an assistant
> branch manager was gaining corporate accounts. Did you ever
> train your employees in the Waycross branch how to be better at
> gaining corporate accounts?
>
> A.     Well, even as a management trainee, you know, just from
> my experience, you know, over – over the phone of talking to
> customers, you know, I would, you know suggest asking them
> certain questions, you know, that would lead up to gaining the
> corporate account.
>
> Q.     And you did that as an assistant branch manager, too; right?

A.   Yes.

Q.   So just to make a clear record, as an assistant branch manager, one of the things that you would train your employees to do is how to be better at gaining corporate accounts; right?

A.   Yes.

Q.   Can you think of anything else that you trained your employees to do in the Waycross branch?

A.   Probably one of the most important things was checking in the cars properly.

Q.   What were the sorts of things that you would teach people about checking cars in properly?

A.   You know, make sure that, you know, there's not any extra dents or scratches, you know, anything that we could be held accountable for.

Q.   And when you taught people how to check cars in properly, would you be teaching management trainees?

A.   Yes.

Q.   Would you also be teaching management assistants if there were any?

A.   No.  They – you know, they've already had the experience.

(Id. at 78-79.)

McQuaig spent "about 60 to 70 percent of the time" she worked as an assistant branch manager "running the counter," which included answering phones, making reservations, and writing tickets.  (Id. at 101.)  She spent "maybe five, ten percent" handling accounts receivable. (Id. at 104.)  She made "callbacks," which she described as including responsibility for "keeping in touch with the customers" and "the body shops . . . that they help us."  (Id.)

McQuaig stated that the branch manager "did all of the schedules." (Id. at 113.) She noted that she helped him at times by "trying to plan some flex time or marketing time," but "as far as making the schedules, [the branch manager] did all the scheduling." (Id.) She never made recommendations to the branch manager with respect to scheduling. (Id. at 114.) While an assistant branch manager, she was never asked for her opinion with respect to the performance of car preps. (Id.) When asked if she "knew whether assistant branch managers have the authority to discipline employees," including sending them home or writing them up, McQuaig responded, "I have never known an assistant manager to have that sole authority to do that." (Id. at 135.)

The branch where McQuaig worked was normally staffed so that either she, an assistant branch manager, or the branch manager was there at all times. (Id. at 135.) Although she had authority to address a management trainee's conduct to a customer and authority over the rental of vehicles while the branch manager was not there, she would sometimes call the branch manager for direction. (Id. at 135-36, 138.) She would always call if an employee was leaving early for any reason, including sickness or discipline. (Id. at 138.)

With respect to management of accounts receivable, McQuaig testified that she would review the accounts receivable list and make the necessary phone calls. She did these same tasks as a management assistant and as a management trainee. (Id. at 167.) She described an incident in which an employee argued with her in front of a customer. She reported this incident to the branch manager, recommending that discipline be taken. (Id. at 241-42.)

On McQuaig's résumé she stated that, as an assistant branch manager with Enterprise Rent-A-Car, she "manage[d] full operations," which included responsibilities for customer service, vehicle rentals, marketing to new and existing corporate clients, collections with accounts receivables, employee development and training, vehicle maintenance and repairs,

creating daily reports, and daily deposits. (Defs.' App., Ex. 31 at ERAC-MONSTER000030, ERAC-BAY000002.)

### h. Biski

During his deposition, Biski testified that as an assistant branch manager at branches in Schenectady and Colonie, New York, he helped train several management trainees. (Defs.' App., Ex. 18 at 144.) He assisted the branch manager in performing a number of duties, such as managing employees in the completion of cycles of service, developing branch operational plans, and managing overall branch operations. (Id. at 146-47, 153.) He explained that he coached, trained, managed, and developed employees as an assistant branch manager, a management trainee, and a management assistant. (Id. at 156.) Developing strategies to solve problems was a responsibility for positions from "MT on up." (Id. at 210.) When he contacted other branches to inquire about borrowing a vehicle, he wanted to deal with the person working the counter – whether that person be a branch manager, assistant branch manager, or management trainee. (Id. at 257.)

On Biski's résumé he stated that, after a promotion to "Assistant Manager," he "[o]versaw Manamgent Trainees and Management Assistants in daily operations" and was "[r]esponsible for building and maintaining branch-specific relationships with corporate accounts." (Defs.' App., Ex. 28 at ERAC-AI.000005.) While still an "Assistant Manager," he "[m]oved to desk inside Liberty Mutual Insurance 5/2006," where he "[w]orked closely with Liberty Mutual claim representatives to control rental severity and cost" and "[w]orked closely with Liberty insureds to help set up rentals and work through the rental process." (Id.) When deposed, he stated that his résumé was accurate, and that the duties listed under "Assistant

Manager" were duties that he did not have as a management trainee or management assistant. (Defs.' App., Ex. 18 at 320-21.)

### i. Rickman

During her deposition, Rickman testified that as assistant branch manager at a branch in Chelmsford, Massachusetts, she did not perform interviews. (Defs.' App., Ex. 7 at 23.) She thought she remembered conducting a review of a management trainee. (Id. at 26.) Normally either the branch manager or she was present at the branch on Saturdays, although she could not remember if a management trainee was there by herself on a few occasions. (Id. at 46.) On days when the branch manager was not present, her responsibilities were no different than on the days when he was present. (Id. at 47.) She was not in charge of "renting the cars," since "we all worked together" with respect to that task. (Id.) She switched branches during her employment, moving to a branch that was "a lot smaller" and had a large "corporate" business mix, although there was also insurance and body shop business. (Id. at 130.) Rickman testified she had no role in setting schedules for employees. (Id. at 175.) Either the branch manager or she would approve time sheets, and when Rickman did this, Rickman was out of the office. (Id. at 271-72.) She performed corporate sales work outside the office. (Id.)

Rickman had responsibility for managing corporate accounts and sales. (Id. at 175-76.) Although she believed that assistant branch managers at other branches were assigned the title of "quarterback of the counter," she was never referred to by that title. (Id. at 201.) She did not need to "develop" the car preps, conduct employee performance reviews, recommend promotion or discipline, set schedules for employees, or keep records. (Id. at 205-06.) If discipline of an employee was necessary, Rickman would talk about it with the branch manager. (Id. at 206.)

She stated, "I don't know if I would recommend; I would merely just tell the facts." (Id. at 208.)

She was asked about hiring decisions:

> Q.     If someone had been interviewed at the branch during the time you were an assistant manager, would it have been part of your job to interview that person?
>
> . . . .
>
> A.     No.
>
> Q.     How do you know that?
>
> A.     Because through my experience it's always been the area manager and branch manager.

(Id. at 209.)

On Rickman's résumé she stated that, as an assistant branch manager with Enterprise Rent-A-Car, she applied "effective problem solving skills for the daily interactions with customers," communicated "with insurance companies on a daily basis in order to obtain rental extensions," analyzed "daily financial statements, per-unit analyses, and end of month closing statements," applied "strategic solutions to maximizing profits and lowing operational costs," managed and deployed "inventory by using the most efficient and cost-effective strategies," and forecasted future profits on a daily and monthly basis with respect to managing any unexpected costs." (Defs.' App., Ex. 27.) She "[s]upervised a staff of 4 employees: performed interviews, coordinated the training of new employees and performance reviews." (Id.) At her deposition, Rickman testified that she did not conduct interviews, despite the indication on her résumé. (Defs.' App., Ex. 7 at 24-25.)

### Standard of Review

Pursuant to 29 U.S.C. § 216(b) of the FLSA, potential plaintiffs must opt in to a collective action suit and affirmatively notify the court of their intentions to join the suit. Asencio v. Tyson Foods, Inc., 130 F. Supp. 2d 660 (E.D. Pa. 2001) (citing Sperling v. Hoffman-La Roche, Inc., 862 F.2d 439, 444 (3d Cir. 1988)). In order to proceed as a representative action under § 216(b), the representative plaintiffs must show that the potential plaintiffs are "similarly situated" to the representative plaintiffs and that each absent collective action member filed a consent to join the action. Id. at 662. To establish that an absent collective action member is "similarly situated," plaintiffs must (1) be or have been employed in the same corporate department, division and location; (2) have advanced similar claims; and (3) have sought substantially the same form of relief. Id. (citing Lockhart v. Westinghouse Credit Corp., 879 F.2d 43, 51 (3d Cir. 1989).

Courts have developed a two-tier method for establishing the burden of proving whether plaintiffs are "similarly situated." Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1213-14 (5th Cir. 1995). The first tier is the "notice phase" which begins when the named plaintiff seeks authorization to issue notice to other prospective class members. Notice usually occurs at an early stage of the proceedings and the court determines the viability of a possible class based on the claim and affidavits submitted in support thereof. Morisky v. Public Serv. Elec. & Gas Co., 111 F. Supp. 2d 493, 497 (D.N.J. 2000). At the first tier, the plaintiff has a fairly low burden of proving the similarly situated requirement. Asencio, 130 F.Supp.2d at 663. Indeed, a court may conditionally certify the class for purposes of notice and discovery under a comparatively liberal standard, i.e., by determining that the members of the putative class "were together the victims of a single decision, policy or plan." Sperling v. Hoffmann-La Roche, Inc., 118 F.R.D. 392, 407 (D.N.J. 1988), aff'd, 862 F.2d 439 (3d Cir. 1988), aff'd, 493 U.S. 165 (1989). At this stage,

"[c]ourts generally examine the pleadings and affidavits of the parties to decide whether notice is appropriate." Villanueva-Bazaldua v. TruGreen Ltd. Partners, 479 F. Supp. 2d 411, 415 (D. Del. 2007).

The second tier occurs when all putative class members have filed their consents to opt-in and further discovery has taken place to support the plaintiff's assertions that the defendant violated the FLSA and the matter is ready for trial. Mueller v. CBS, Inc., 201 F.R.D. 425 (W.D. Pa. 2001). The court reconsiders the class certification question after conducting a fact-specific review of each class member who has opted-in, taking into account factors such as employment setting, termination procedures, defenses asserted against various plaintiffs, and other procedural issues. Id. If the court determines that the plaintiffs are not "similarly situated," the conditional class is decertified. Id.

### Proposed Class

Plaintiffs seek certification of all current and former assistant branch managers employed by ERAC-Missouri or the operating subsidiaries of ERAC-Missouri named in the amended master complaint at any time during the three years prior to the filing of the motion for conditional certification, who

> . . . (ii) are/were not paid for all of the hours worked in a given workweek; (iii) are/were not paid overtime compensation at a rate not less than one and one-half times their regular rate for each hour worked beyond forty (40) during a workweek; and (iv) choose to opt-in to this action . . . .

(Docket No. 73 at 2.)

As explained in the memorandum opinion filed concurrently with this opinion, the court granted ERAC-Missouri's motion for summary judgment on joint employer issues. Because of

the disposition of the motion for summary judgment, there are no claims pending against ERAC-Missouri, and conditional certification with respect to the claims against ERAC-Missouri is moot. The court will address conditional certification only with respect to plaintiffs or potential plaintiffs employed by the subsidiaries of ERAC-Missouri named as defendants in the cases consolidated for pretrial purposes in this multidistrict litigation.[9]

### *Discussion*

## I. Appropriate Standard

The two-tier structure for analyzing conditional certification issues applies in the usual situation. The parties dispute, however, whether the typical structure should apply here at this stage of the proceedings. Plaintiffs assert that it should. Defendants argue, however, that after substantial discovery is completed, but full merits discovery is not yet finished, a stricter, intermediate standard of proof for conditional certification is appropriate.

In Bunyan v. Spectrum Brands, Inc., No. 07-CV-0089, 2008 WL 2959932, at *4 (S.D. Ill. July 31, 2008), the court observed that after the discovery process starts and significant discovery is conducted, other courts apply a higher level of scrutiny in analyzing conditional certification motions in cases raising FLSA claims. The other courts typically took one of two approaches. "[S]ome courts collapse the two-step inquiry into one and consider only the second inquiry." Id. at *3. Other courts "incorporate[] the procedural aspect of conditional certification with the substantive analysis appropriate under each prong." Id. at *4. In accordance with this approach:

> ["]The court will determine whether conditional certification of a collective action is appropriate by evaluating all the facts that have

---

[9] After this court resolves the pretrial issues raised in this multidistrict litigation and the consolidated cases are ready for trial, it will transfer the cases back to the jurisdictions from which they came. ERAC-Missouri is no longer a defendant in these consolidated cases. Under those circumstances after the transfer back, the plaintiffs in each case will only be those plaintiffs employed by the operating subsidiary named as a defendant in that case.

> thus far been placed before it. Thus, procedurally, the court is not making any final decisions, and [the defendant] will have an opportunity to later decertify the class if the court approves conditional certification and authorizes notice. Furthermore, substantively, the court will ultimately use the more onerous second stage analysis to account for all the important facts learned through discovery that inform what putative plaintiffs, if any, are similarly situated to existing plaintiffs.["]

Id. (quoting Bouaphakeo v. Tyson Foods, Inc., 564 F. Supp. 2d 870, 895 (N.D. Iowa 2008)). The court concluded that "where substantial but not all discovery has taken place, the intermediate two-step approach seems particularly appropriate." Id. Courts within the Third Circuit have followed this second approach. See, e.g., Villanueva-Bazaldua, 479 F. Supp. 2d at 415.

In Bouaphakeo, the parties completed class discovery. Discovery included depositions of six named plaintiffs, twelve potential opt-in plaintiffs, and four corporate representatives. The defendant responded to twelve interrogatories, and produced approximately 3,000 pages of responsive documents. Over thirty employees of the defendant submitted declarations. Bouaphakeo, 564 F. Supp. 2d at 894. The court determined that, because of this "limited, but substantial discovery," the case was not at a "typical 'notice stage.'" Id. The court applied the intermediate standard, which was above that applied to the usual notice stage, but below that applied at the second stage. Id. at 895.

The court initially conducted a substantive analysis under the first step. The plaintiffs proposed to define the collective class as all employees at the defendant's food processing plant who were paid on an hourly basis. The court concluded that the first step considerations "support Plaintiffs' request for conditional certification." Id. at 896.

The court proceeded to analyze "the relevant factors under the second step." Id. at 897. With respect to the employment and factual settings of the plaintiffs, the court observed that they

all worked at the same processing plant and most were paid on a gang time basis. The employees were spread among six different departments and had differing job responsibilities. Id. All employees paid on a gang time basis, however, wore similar protective clothing and used similar equipment. Id. at 898-99. The court concluded that the employment and factual settings of the plaintiffs supported collective action certification limited to a collective action class comprised of those employees paid under a gang time compensation system. This collective action class was more limited than that proposed by the plaintiffs, which would have been comprised of all workers paid on an hourly basis. Id. at 899.

With respect to the defenses available to the defendant, the defendant argued that many would require individualized inquiry, such as the statute of limitations or whether pre-shift or post-shift activities – e.g., putting on or removing protective gear – constituted "work" under the FLSA. Id. The court determined that there were a number of factual similarities among the plaintiffs with respect to those defenses. Id. at 899-900. With respect to fairness, manageability, and procedural considerations, the court found that, in limiting that collective action class, "the similarities outweigh the dissimilarities, and a fair playing field is created." Id. The court conditionally certified the collective class and held that notice to potential class members was appropriate. Id. at 909-10. The court stated:

> The court does believe, however, that potential plaintiffs are similarly situated if the collective action class is limited to only those production employees that are paid via gang time. Gang time, after all, is the company-wide policy that Plaintiffs claim violates the FLSA. . . . [D]ue to the fact that the court is proceeding *procedurally* under the first step of collective action certification, this court's decision simply *conditionally* certifies the redefined collective action class. Thus, [the defendant] has every opportunity to move to decertify or further limit the class in the future.

Id. at 901.

In Gandhi v. Dell Inc., No. A-08-CA-248, 2009 WL 1940144, at *1 (W.D. Tex. July 2, 2009), a plaintiff brought an FLSA collective action on behalf of the defendant's business sales representatives, arguing that the defendant violated the FLSA rights of the sales representatives. Other sales representatives joined and moved for conditional certification. Similar to this case, the court was faced with the need to determine the appropriate standard to apply to the collective action certification decision. Id. at *4. The plaintiffs argued for the application of the lenient standard usually applied at the notice stage, but the defendant asked the court to bypass the notice stage and apply a stricter standard:

> One of the puzzling aspects of this issue in the present case is that the parties agreed to a scheduling order which explicitly contemplated discovery being conducted before a motion for class certification would be filed. As stated above, parties generally move for conditional certification early on in a case when little to no discovery has been conducted. Given that most cases addressing the standard of review for conditional certification base their decision in large part on the status of discovery, one would have thought that if the parties were agreeing to a discovery schedule, they would also have agreed on the standard to be applied in determining if this case should proceed as a collective action. That is not the case, however. At the hearing, Plaintiffs' counsel stated that it was his understanding that discovery would be very preliminary and limited in scope, and therefore, the Court should review the collective action certification under the more lenient, initial review standard. Defense counsel, on the other hand, argued that because several months were set aside for discovery, because thousands of pages of documents have been exchanged, and because nearly twenty depositions have been taken, using the lenient standard–which is predicated on the assumption that little or no discovery has occurred–would be inappropriate here.

Id. at *5. The court decided to apply a standard virtually identical to the intermediate standard:

> There is merit to both sides' contentions on this issue. Plainly, because of the amount of discovery conducted to this point, this is not a classic case where the lenient standard is clearly appropriate. The parties contemplated that they would conduct discovery before the certification issue would be decided, and, given this, it does not seem wholly appropriate to use a very lenient standard, particularly

when such a standard was adopted for situations when little or no discovery had been conducted. Further, the case has been pending for more than a year, and the parties had six months to conduct what the scheduling order described as the "discovery related to Plaintiff's Anticipated Motion for Certification." On the other hand, it is clear that discovery is far from complete. Indeed, Plaintiffs contend that they have not received several pertinent records which could potentially bolster their claims (i.e., payroll records, internal communications, etc.), and [the defendant] has denied Plaintiffs much discovery on the basis that the discovery requests were premature and not related to the certification issue. . . . On balance, the Court believes that it would be inappropriate to apply the stricter second-stage standard to this case given the fact that the discovery to date has been quite limited, and the Court is far from being fully informed on the facts relevant to making the certification decision. Accordingly, in reviewing the Plaintiffs' motion for certification, the Court will apply the more lenient "notice stage" standard . . . . Having said this, the Court will not ignore the information before it. Rather, in reviewing the material presented by the parties, the Court will give the benefit of the doubt to the Plaintiffs given that they have not conducted full discovery on their claims.

Id.

The court finds that, even if an intermediate standard is used in this case, the analysis of the evidence of record in light of relevant factors requires the conditional certification of the collective action. Similar to the analysis applied in Bouaphakeo, this court will consider the factors relevant to the first step and an intermediate step.[10]

**II. Analysis**

**A. First Step**

A number of factors are relevant at the first step, including "'whether potential plaintiffs were identified; whether affidavits of potential plaintiffs were submitted; . . . whether evidence of a widespread discriminatory plan was submitted; and whether as a matter of sound case

---

[10] The court will not undertake the second step analysis at this stage. A true second-step analysis – one that makes a final certification determination – should not take place until the case is "ready for trial." See Herring v. Hewitt Assocs., Inc., No. 06-267, 2007 WL 2121693, at **3-4 (D.N.J. July 24, 2007). Neither plaintiffs nor defendants argued that the consolidated cases are trial ready.

management; . . . a manageable class exists.'" <u>Lemus Guerrero v. Brickman Group, LLC</u>, No. 1:05-CV-00357, 2007 WL 922420, at *2 (W.D. Mich. Mar. 26, 2007), <u>rev'd on other grounds on reconsideration</u>, No. 05-CV-00357, 2007 WL 2381943 (W.D. Mich. Aug. 17, 2007) (quoting <u>Olivo v. GMAC Mortg. Corp.</u>, 374 F. Supp. 2d 545, 548 (E.D. Mich. 2004)). There are approximately 3,000 assistant branch managers working at branches outside of California operated by the subsidiaries. There are nine operating subsidiaries that are named defendants in the actions consolidated in this court for pretrial purposes. There are thirteen named plaintiffs and ninety-seven opt-in plaintiffs who have already joined the litigation.[11] More than twenty of the plaintiffs submitted declarations.[12] (<u>See</u> Pls.' App., Exs. H-K, M-R, T-Z, AA-CC, FF, GG.) In <u>Bouaphakeo</u>, the court considered the number of opt-in plaintiffs and affidavits in determining that the evidence proffered satisfied the first step of the analysis. <u>Bouaphakeo</u>, 564 F. Supp. 2d at 896-97.

Defendants attack the statements contained in the declarations submitted by plaintiffs, arguing that deposition testimony of the sample plaintiffs contradicts statements in the declarations. Defendants argue that those plaintiffs' résumés and statements on job applications contradict the declarations. The credibility issues raised by defendants' argument, however, are not relevant to first step. "At the initial assessment stage, before discovery is completed, the court does not resolve factual disputes, decide substantive issues going to the ultimate merits or make credibility determinations." <u>Summa v. Hofstra Univ.</u>, No. 07-3307, 2008 WL 3852160, at *2 (E.D.N.Y. Aug. 14, 2008) (citing <u>Young v. Cooper Cameron Corp.</u>, 229 F.R.D. 50, 54

---

[11] The court recognizes that a number of the ninety-seven opt-in plaintiffs may no longer be part of this case, because ERAC-Missouri was dismissed as a defendant from this action for reasons set forth in the memorandum opinion filed concurrently with this one. The only opt-in plaintiffs that are properly part of this multidistrict litigation are those that worked for one of the nine operating subsidiaries that are defendants in this multidistrict litigation.

[12] Plaintiff withdrew several of these declarations to comply with the discovery order that established a process to select sample plaintiffs for conditional certification issues. (Docket No. 91.)

(S.D.N.Y. 2005)); see Bamgbose v. Delta-T Group, Inc., No. 09-667, 2010 WL 431711, at *5 (E.D. Pa. Feb. 8, 2010) (at the first stage, "[t]he court does not make any credibility determinations or findings of fact when presented with contrary evidence").

Many courts finding insufficient evidence of other potential class members at the first step were presented with a nominal number of affidavits that made broad allegations about the treatment of other employees. In contrast, here a number of plaintiffs submitted declarations and testified at their depositions with respect to their treatment. Compare Bunyan, 2008 WL 2959932, at *7 (only evidence was a single plaintiff's affidavit containing job descriptions that were allegedly applied to others), and Villanueva-Bazaldua, 479 F. Supp. 2d at 415 (noting "the only 'evidence' that other [employees of the defendant] incurred–without reimbursement–any of the expenses alleged is the terse declaration of" the plaintiff, and holding this evidence insufficient), with Harris v. Healthcare Servs. Group, Inc., No. 06-2903. 2007 WL 2221411, at **1-4 (E.D. Pa. July 31, 2007) (finding first step met based upon four employee affidavits and two attorney affidavits that detailed the pay history of five other employees). After considering the declarations and deposition testimony which detailed the job duties and responsibilities of sample plaintiffs, and given the job descriptions and classifications which were common among the defendant operating subsidiaries, the court finds with respect to the first step that plaintiffs' evidence is sufficient.

**B. Intermediate Step**

With respect to the intermediate step, the court will consider the factors at issue in the second step, but under a less stringent standard. The relevant factors include: "(1) disparate factual and employment settings of individual plaintiffs; (2) the various defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural

considerations." Underwood v. NMC Mortg. Corp., 245 F.R.D. 720, 721 (D. Kan. 2007) (citing Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1102-03 (10th Cir. 2001)).

Plaintiffs argue that conditional certification of the proposed collective class is appropriate in this case by reason of the standardization of the various aspects of branch operations among ERAC-Missouri's subsidiaries. This standardization resulted in the members of the proposed collective class being: (1) classified by defendants as exempt, (2) paid a salary in accordance with a standard compensation guide, (3) subject to uniform job descriptions and responsibilities, (4) required to perform substantially similar job duties, (5) evaluated under a standardized set of performance objectives, and (6) routinely required to work in excess of forty hours per week without receiving overtime compensation.

Defendants argue in response that, in analyzing whether plaintiffs are similarly situated for purposes of their FLSA claims, the court must analyze the four applicable exemptions to the overtime requirements: executive, administrative, outside sales, and combination. To qualify for exemption, "an employee's 'primary duty' must be the performance of exempt work." 29 C.F.R. § 541.700(a).

> Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

Id. Defendants assert that the evaluation of the exemptions requires the court to analyze on an individual basis each plaintiff's specific duties. Defendants argue that the job duties and responsibilities of the sample plaintiffs varied from individual to individual, location to location,

and over time, depending on a number of factors, such as the operating subsidiary's unique

practices, the region, and the size, business mix, and staffing of the branch location.

## 1. Factual and Employment Settings of Plaintiffs

### a. Plaintiffs' Declarations

In arguing that the job duties and responsibilities of plaintiffs were dissimilar, defendants

challenge the declarations of plaintiffs, which portray plaintiffs as holding comparable positions.

As already mentioned, defendants argue the sample plaintiffs' deposition testimony, résumés,

and statements on job applications contradict statements in the declarations.

In Gandhi v. Dell Inc., which presented a situation similar to this case, the court stated it

"will give the benefit of the doubt to the Plaintiffs given that they have not conducted full

discovery on their claims." Gandhi, 2009 WL 1940144, at *5. Here, in evaluating the evidence

at this stage, the court will likewise view the evidence of record in plaintiff's favor.

Viewing the deposition testimony of record as a whole and construing the evidence in the

light most favorable to plaintiffs, the court finds that the declarations are, for the most part,

consistent with the record. Much of the deposition testimony elaborates upon many of the

statements contained in the declarations and plaintiffs qualify some of their averments, but the

court finds that the majority of the averments in the declarations are consistent with the

testimony. The court cannot categorically dismiss the probative value of the declarations as

defendants posit the court should.[13] With respect to the sample plaintiffs' résumés and job

applications, the court finds that despite some plaintiffs contradicting some of the statements

made in their declarations, the contradictions, which may be puffery or useful to attack

---

[13] Defendants cite Goff v. Bayada Nurses, Inc., 424 F. Supp. 2d 816, 819-20 (E.D. Pa. 2006), in arguing that the declarations should be ignored. The Goff decision, however, was rendered at the summary judgment stage, and not at the conditional certification stage. See id. Since the court finds that the declarations are for the most part consistent with other evidence, and given the procedural stage of this matter, the court will consider the declarations in analyzing plaintiffs' evidence.

credibility, do not render all material averments made in the declarations unreliable. To the extent certain plaintiffs specifically contradicted their declaration statements by their deposition testimony, the court relies upon the deposition testimony.

Comparing the deposition testimony to the declarations, the most troublesome aspect of the declarations are the averments that plaintiffs knew other assistant branch managers were subject to similar conditions and performed similar duties. With the exception of Bajkowski, who made clear that his knowledge was based upon speaking with two assistant branch managers and observing ten to fifteen others, the other plaintiffs provide little support for their belief that other assistant branch managers performed the same duties as they did. The evidence of record, however, consists of numerous declarations and testimony of assistant branch managers showing they were subject to similar treatment even in the absence of these averments.

### b. Evaluation of the Evidence of the Factual and Employment Settings

The court finds the evidence of the factual and employment settings of plaintiffs is sufficient to support collective action certification at this time. Plaintiffs were employed as assistant branch managers of defendant operating subsidiaries, working at branches operated by defendant operating subsidiaries. Although they had some management responsibilities, evidence adduced by plaintiffs show those responsibilities were limited. Notwithstanding varying degrees of involvement in the hiring process, they did not have authority to hire employees and all key personnel decisions were handled by the branch managers. The same holds true for termination and other workforce-related decisions. A significant portion of their day-to-day activities included the renting of vehicles, cleaning and washing cars, picking up and dropping off cars, and completing rental paperwork. They completed these same tasks when employed as management trainees.

ERAC-Missouri created job descriptions for a variety of positions, based upon information regarding the job duties and responsibilities of those positions as observed in practice. Viewed in plaintiffs' favor, this evidence supports the reasonable inference that the vast majority of the assistant branch managers performed comparable duties even though they worked for different operating subsidiaries. ERAC-Missouri created a compensation guide and made recommendations with respect to the FLSA exemption status of various positions. Each defendant operating subsidiary followed the guide and adopted the recommendations. The guide and recommendations were based upon the practices of the operating subsidiaries.

All assistant branch managers, with the exception of those in California, were classified as exempt from the FLSA overtime provisions. Although there may not be a mandatory policy all subsidiaries are required to follow, the court cannot overlook this uniformity for purposes of analyzing whether plaintiffs are similarly situated. See Rawls v. Augustine Home Health Care, Inc., 244 F.R.D. 298, 300 (D. Md. 2007) ("The first factor of the decertification analysis involves an assessment of whether Plaintiffs have provided evidence of a company-wide policy which may violate the FLSA, as well as an assessment of Plaintiffs' job duties, geographic location, supervision, and salary.").

In addition to the job descriptions that were prepared based upon a nationwide survey of the actual job duties performed, deposition testimony and a number of declarations support a finding that assistant branch managers performed job duties similar to those performed while working in nonexempt positions. Cf. Bunyan, 2008 WL 2959932, at *7 (finding plaintiffs were not similarly situated where only evidence was a job description and a compensation plan; there was no evidence with respect to what job duties the potential plaintiffs performed). As already explained, the résumés and deposition testimony are not inconsistent with all material averments

in the declarations. At this stage, viewing the facts in the light favorable to plaintiffs, the factual and employment settings of plaintiffs are comparable, especially keeping in mind that if these cases survive summary judgment, they will be transferred back to the jurisdictions in which they were filed and all plaintiffs in a case will be or have been employed by the same operating subsidiary.

Defendants focus upon a number of differences with respect to the settings in which plaintiffs worked. Defendants created charts they allege demonstrate that certain plaintiffs performed tasks that others did not. (See Defs.' App., Exs. 22, 36.) Defendants argue that the location of the branch affects the job responsibilities of the assistant branch managers. For example, defendants contrast McQuaig, who worked at a small branch where she spent the majority of her time at the counter, to Graham, who worked at a larger branch with a greater assortment of employees. The court is not convinced at this stage of the significance of this difference. Both Graham (who worked at several different branches) and McQuaig, in addition to numerous other plaintiffs who served as assistant branch managers, testified that their job duties were comparable to those of the management assistants or management trainees – regardless of the location at which they worked.

Defendants argue that an assistant branch manager at a branch with a large number of employees spent more time performing administrative or executive tasks, and was more likely to be exempt under the FLSA, than an assistant branch manager at a small location who might not have had adequate staffing to handle tasks such as washing vehicles or picking up customers. Defendants argue that the business mix affected the duties of the assistant branch managers. Again, the deposition testimony does not clearly establish the significance of these differences. Hagler and Bajkowski stated that the duties would only be "a little" different, (Defs.' App., Ex.

23 at 106; Defs.' App. 21 at 28), Singleton said "it can change things a little" but that "a Monday morning is pretty busy across the board," (Defs.' App., Ex. 26 at 119,), and Hickton testified that some assistant branch managers may perform their duties "on a grander scale, but I don't think there was a difference in responsibilities" and "I wouldn't say that the primary or majority of responsibilities are that much different, no," (Defs.' App., Ex. 17 at 281-82).  Plaintiffs need not show that they were identically situated to other potential plaintiffs, but only that they were similarly situated.  Sperling, 118 F.R.D. at 405; see Indergit v. Rite Aid Corp., Nos. 08 CIV. 9361, 08 CIV. 11364, 2010 WL 2465488, at *8 (S.D.N.Y. June 16, 2010); Hewitt, 2007 WL 2121693, at *6 (holding that job differences between plaintiffs employed in an identical position, which were evidenced by differing percentages of time spent performing various tasks, were not sufficient to prevent conditional certification, since "[a]t this notice stage of the proceedings, Plaintiff is not required to make a substantial showing that she is substantially similar to the potential class members," and "courts employ a lenient standard when determining if a potential class is similarly situated and should be noticed"); Damassia v. Duane Reade, Inc., No. 04 Civ. 8819, 2006 WL 2853971, at *6 (S.D.N.Y. Oct. 5, 2006) ("On defendant's logic, no group of opt-in plaintiffs would ever be 'similarly situated' unless they were clones of one another working in completely identical stores, in identical neighborhoods, with identical clientele.").[14]

Decisions denying conditional certification in cases raising FLSA claims present facts distinguishable from this case.  In Kronick v. bebe Stores, Inc., No. 07-4514, 2008 WL 4546368,

---

[14] The court notes that, based upon the various differences highlighted by defendant, the court may create subclasses.  See Aguilar v. Complete Landsculpture, Inc., No. 04-0776, 2004 WL 2293842, at *3 (N.D. Tex. Oct. 7, 2004) ("if discovery shows that certain plaintiffs are not similarly situated due to differences in employers, the court can decertify the class or can create subclasses."); Rodolico v. Unisys Corp., 199 F.R.D. 468, 484 (E.D.N.Y. 2001) ("If, at a later point in the litigation, the Court finds that a collective action cannot accommodate the proposed individual defenses, the Court has the discretion to create subclasses or to dismantle the collective action.").  For example, this case may be broken down into subclasses based upon the type of branch (e.g., airport, dealership, etc.).  The court, however, will not create subclasses at this point.  The court will entertain such arguments upon a motion for decertification.

at *3 (D.N.J. Oct. 2, 2008), the affidavits submitted were "so bereft of detail." Id. at *3. Three affidavits were submitted, and only two contained allegations that the employees were trained to perform work in a manner that violated the FLSA. The affidavits lacked explanations related to how the affiant knew the conditions other workers were subjected to at other retail locations. The record also lacked evidence of a common practice applied at all the defendant's retail stores, and there was no evidence that the defendant used the same compensation system for other employees holding the same position. Id. In Morisky v. Public Service Electric and Gas Co., 111 F. Supp. 2d 493, 498 (D.N.J. 2000), the potential plaintiffs, although they worked at a single power plant operated by the defendant, held a variety positions and performed diverse job duties:

> Plaintiffs have made no showing that the job responsibilities of the named plaintiffs are the same or similar to those of the remaining members of the proposed class, or that the opt-in plaintiffs could properly be classified as non-exempt employees. In fact, plaintiffs do not even discuss the job responsibilities of the opt-in plaintiffs. Instead, plaintiffs reference an extremely broad "general connection" all plaintiffs have to the production of electricity. Defendant, on the other hand, has pointed to many specific dissimilarities between the job duties of the name plaintiffs and the opt-in plaintiffs which make certification as a collective action inappropriate. Defendant references many of the over 100 fact questionnaires plaintiffs solicited from [the defendant's] employees, which show that the opt-in plaintiffs hold a wide variety of positions and perform a wide variety of job duties. . . . To the extent that any of these employees may be properly classified as exempt, these potential plaintiffs simply are not similarly situated with the named plaintiffs.

Id. at 498.

Here, plaintiffs all held the same position – assistant branch manager. Based upon a nationwide review, the duties and responsibilities of persons holding that position were so sufficiently similar a single job description was created by ERAC-Missouri to describe and recommend a single set of job duties. ERAC-Missouri recommended similar compensation for

this position. ERAC-Missouri's operating subsidiaries, with the exception of those in California, all adopted the recommendations. Defendants now ask the court to give significant weight to variances in the job duties that were not significant enough to prevent ERAC-Missouri from making universal FLSA exemption recommendations. If after observing the practices of the subsidiaries, ERAC-Missouri found the variances to be so significant that exemptions would have to be made on a case-by-case basis, ERAC-Missouri could not have rationally communicated to the subsidiaries a recommendation that assistant branch managers qualify as exempt under the FLSA. One may logically infer that all subsidiaries comprising the Enterprise network, with the exception of those in California, found the job differences did not affect the compensation of assistant branch managers or whether they were exempt employees.[15] See Chowdhury v. Duane Reade, Inc., No. 06-2295, 2007 WL 2873929, at *5 (S.D.N.Y. Oct. 2, 2007) ("Defendants cannot defeat a § 216(b) motion simply by pointing out all the ways in which plaintiff's exact day-to-day tasks differ from those of the opt-in plaintiffs; instead, defendants must show that plaintiffs are not similarly situated *in ways relevant* to their entitlement to overtime compensation under FLSA . . . ."). The court determines that plaintiffs submitted sufficient evidence at this stage of the proceedings to satisfy their burden to show similarities exist between the factual and employment settings of potential plaintiffs in each consolidated case.

### 2. Defenses Available to Defendants

---

[15] This case is somewhat unique due to the evidence of similar treatment throughout the Enterprise network of operating subsidiaries. Even though a parent is a not joint employer under the FLSA, collective action certification may still be appropriate. Cf. Aguilar, 2004 WL 2293842, at *3. Here, there are eight cases against different operating subsidiaries consolidated for pretrial purposes and there is evidence that plaintiffs are similarly situated with respect to their employers, despite the court's determination in the memorandum opinion concurrently filed with this opinion that ERAC-Missouri is not a joint employer.

Defendants did not specifically assert any defenses in their arguments, but they contest the veracity of plaintiffs' allegations. Defendants assert that plaintiffs' daily duties were tasks that qualified them as exempt under the FLSA. Defendants argue that the issues raised will have to be dealt with on a plaintiff-by-plaintiff basis. The analysis with respect to these arguments is similar to that regarding the factual and employment settings of plaintiffs. Plaintiffs are not so dissimilar that collective action certification is improper at this time.

In Bouaphakeo, the court also faced individualized defenses, but found the evidence presented was sufficient to grant collective action certification. The court compared the number of factual similarities to the number of dissimilarities, and found a greater number of similarities:

> The court agrees with Plaintiffs, however, that these questions highlighting [the defendant]'s possible defenses do not disfavor conditional certification because these possible defenses are not as individualized as [the defendant] wants the court to believe. [The defendant]'s argument that there are individualized defenses is premised on its belief that there are numerous factual disparities among putative plaintiffs. [The defendant] is correct if the putative collective action class is defined as all hourly employees. But as the court found above, when the putative plaintiffs are limited to those that are paid via a gang time system, there are far more factual similarities than dissimilarities.

Bouaphakeo, 564 F. Supp. 2d at 899-900. The court found that individualized defenses, such as determining whether certain job activities were de minimus, were better raised at the summary judgment stage:

> Moreover, the courts that often address these supposed individualized defenses often do so after collective action certification is granted, such as on summary judgment or on appeal. See De Asencio v. Tyson Foods, Inc., 500 F.3d 361, 364-65 (3d Cir.2007) (determining these questions on appeal from a denial of summary judgment and after collective action certification was approved). Thus, the court is not persuaded that this factor supports [the defendant]'s argument for individual, rather than collective, treatment in this case, so long as the

> collective action class is limited to those that are paid via a gang
> time system.

Id. at 900.  The court concludes that the number of similarities, especially considering the

common policies adopted by the operating subsidiaries, are greater than the number of individual

differences, warranting the grant of conditional certification at this stage of the proceedings.

### 3. Fairness and Procedural Considerations

The third factor requires the court to consider fairness, manageability, and procedural

considerations.  These considerations focus upon "whether a trial may be coherently managed in

a way that will not confuse the jury or unduly prejudice a party."  Molina v. First Line Solutions

LLC, 566 F. Supp. 2d 770, 787 (N.D. Ill. 2007).  Once pretrial issues are resolved and the

consolidated cases are transferred back to the courts from where they came, the cases will be

limited to at most two defendant operating subsidiaries.  Under those circumstances, the trials

can be managed in ways that are unlikely to prejudice a party or confuse the jury.

 The Supreme Court recognized that a collective action affords plaintiffs "the advantage

of lower individual costs to vindicate rights by the pooling of resources."  Hoffmann-La Roche,

Inc., 493 U.S. at 170.  At this point it is not clear what the amounts of damages are, but there is a

possibility that plaintiffs would be unable to afford the costs of individually pursuing their

claims.  See Russell v. Illinois Bell Telephone Co., No. 08 C 1871, 2010 WL 259234, at *16

(N.D. Ill. June 28, 2010) (considering damages in evaluating the manageability of an FLSA

action).

At this point, the court concludes that the fair and proper course of action is to certify

conditionally the collective action and authorize notice to potential plaintiffs.  The court bears in

mind that its determination "'does not prejudice the defendants precisely because it is

preliminary.'"  Herring, 2007 WL 2121693, at *4 (quoting Aquilino v. The Home Depot, Inc.,

No. 04-CV-4100, 2006 WL 2583563, at *2 (D.N.J. Sept. 7, 2006)).  Since this case procedurally is still at the first stage, even considering the intermediate matters, plaintiffs' burden should be "light because the risk of error is insignificant: should further discovery reveal that the named positions, or corresponding claims, are not substantially similar the defendants will challenge the certification and the court will have the opportunity to deny final certification."  Craig v. Rite Aid Corp., No. 08-cv-2317, 2009 WL 4723286, at *2 (M.D. Pa. Dec. 9, 2009).  Procedurally, the court at the decertification stage will apply a more-exacting analysis and stringently focus upon the day-to-day job duties of particular plaintiffs.  At this stage, however, the court finds that plaintiffs met their burden to justify the grant of conditional certification.

### Conclusion and Order

For the reasons explained above, **IT IS ORDERED** that plaintiffs' motion for conditional certification (Docket No. 73) **IS GRANTED**.  **IT IS FURTHER ORDERED** that a collective class is conditionally certified pursuant to the FLSA, as modified for reasons set forth in this memorandum opinion.  The court will allow notice and opportunity to opt-in to the following collective class:

> All current and former assistant branch managers who at any time during the three years prior to the filing of the motion for conditional certification (1) are/were employed by the subsidiaries of ERAC-Missouri named as defendants in the cases consolidated for pretrial purposes in this multidistrict litigation; (2) are/were not paid for all of the hours worked in a given workweek; (3) are/were not paid overtime compensation at a rate not less than one and one-half times their regular rate for each hour worked beyond forty during a workweek; and (4) choose to opt-in to this action.

**IT IS FURTHER ORDERED** that within twenty (20) days defendants must produce to plaintiffs' counsel the names and addresses of all members of the collective class.

**IT IS FURTHER ORDERED** that notice shall be issued to all members of the collective class in accordance with Hoffman-La Roche v. Sperling, 493 U.S. 165 (1989). The parties shall confer and attempt to agree upon a proposed collective class notice and shall file the proposed notice on the docket within twenty (20) days from the date of this Order.[16] If the parties cannot reach agreement upon a proposed collective class notice, plaintiffs shall file a motion for approval of their proposed collective class notice within twenty (20) days from the date of this Order, and defendants shall file a response within fourteen (14) days from the date of service of plaintiffs' motion for approval of proposed class notice.

Dated: August 13, 2010

By the court,

/s/ Joy Flowers Conti _____
Joy Flowers Conti
United States District Judge

---

[16] The court notes that the proposed notice of collective action and proposed consent to sue forms attached as exhibits to the declaration of Robert Biela (Pls.' App., Exs. II, JJ) must be modified, because they name ERAC-Missouri as a defendant.